1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT FOR THE

8                      EASTERN DISTRICT OF CALIFORNIA

9
    CATHERINE SANCHEZ,                    )      1:10cv01477 AWI DLB
10                                        )
                     Plaintiff,           )      FINDINGS AND RECOMMENDATIONS
11                                        )      REGARDING PLAINTIFF'S
                                          )      SOCIAL SECURITY COMPLAINT
12                                        )
            vs.                           )
13                                        )
    MICHAEL J. ASTRUE, Commissioner of    )
14  Social Security,                      )
                                          )
15                   Defendant.           )
                                          )
16  _____ )

17                            **BACKGROUND**

18          Plaintiff Catherine Sanchez ("Plaintiff") seeks judicial review of a final decision of the

19  Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

20  Benefits ("DIB") pursuant to Title II of the Social Security Act.  The matter is currently before the

21  Court on the parties' briefs, which were submitted, without oral ar6gument, to the Magistrate Judge

22  for findings and recommendations to the District Court.

23                   **FACTS AND PRIOR PROCEEDINGS**[1]

24          Plaintiff filed for DIB on March 6, 2008.  AR 109-14.  She alleged disability since October

25  18, 2007, due to arthritis of spine, high blood pressure, diabetes, knee pain, sleep disorder and acute

26  _____

27          [1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

28                                      1

depression.  AR 124-33.  After being denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 52-56, 58, 60-64.  On December 2, 2009, ALJ William Thompson, Jr. held a hearing.  AR 28-45.  ALJ Thompson denied benefits on February 11, 2010.  AR 8-19.  On June 14, 2010, the Appeals Council denied review.  AR 1-4.

Hearing Testimony

ALJ Thompson held a hearing on December 2, 2009, in Stockton, California.  Plaintiff appeared with her attorney, Shellie Lott.  Vocational expert Stephen Schmidt also appeared.  AR 30.

Plaintiff was born in 1966.  She graduated from high school and completed one semester of college.  She is 5'11" and weighs about 260 pounds.  She is left handed.  AR 32.

Plaintiff last worked on October 1, 2007.  She has not attempted to work since then.  Her last job was driving trucks and training for Swift Transportation, which she did on and off for ten years.  In 1994 and 1995, she was a lab technician on a chicken farm, where she artificially inseminated chickens.  She also worked as a CNA for four years.  AR 33-34.

Plaintiff reported that her arm, neck and lower back now keep her from working.  She was involved in an accident at work.  She has received some payments from worker's compensation, but the case is ongoing.  AR 34-35.

Plaintiff identified problems in her lower back, including the curve and around to the coccyx.  Dr. Walker, a chiropractor, is her primary physician.  He sends her to specialists.  She has not been treated by a medical doctor, with the exception of evaluations and physical therapy.  She went to a pain management specialist in conjunction with her physical therapist and received pain medication.  She has not had back surgery.  One doctor recommended surgery, but she has not heard anything since the evaluation.  She has not had any back injections for pain and physical therapy has not helped.  AR 35-36.

Plaintiff lives in an apartment with a roommate.  They share chores, but he does the majority.  She sits and vacuums the floor.  She empties and loads the dishwasher.  She sweeps the bathroom and kitchen.  Mopping and scrubbing the floor is hard because it requires getting down on hands and knees.  She cooks simple meals about twice a week.  AR 36-37.

Plaintiff testified that she can walk a mile on a good day, but only has one good day a month. On a bad day, she can walk "way less" than a half mile. She can stand about thirty minutes. She can sit about thirty minutes to an hour in soft chair, but has to switch from side to side. In a hard chair, she can sit for ten or fifteen minutes. She can lift eight pound hand weights and a gallon of milk. She goes to the grocery store two times a week. AR 37-38.

Plaintiff reported a severe migraine that started about two weeks prior to the hearing and had not gone away. To treat migraines, she takes ibuprofen, uses a heating pad and rests. She has never been treated for any mental or emotional problems and she does not take any medication to help with them. AR 38-39.

Plaintiff testified that she needs assistance from time to time with bathing and dressing. She needs help fastening her bra and pants, washing her hair, and putting on shirts. She takes over-the-counter ibuprofen and Tylenol PM for pain. She used to take prescription medication, but it made her very groggy and unsteady. AR 39-40.

Plaintiff explained that she tore the meniscus in her right knee. She still has pain, but it is better. It only hurts when she gets on her hands and knees to scrub the floor. She received a steroid injection to help with the inflammation and condition of her knee. AR 40.

Plaintiff testified that she gets migraines four times a week. She also has numbness and tingling in her left arm and loss of feeling in four fingers. She has problems reaching up, picking things up and buttoning things. She also has numbness and tingling in her feet from prolonged sitting or lying down. AR 41. She has difficulty socializing and feels depressed. AR 41-42.

The vocational expert ("VE") also responded to questions. He identified Plaintiff's past work as a truck driver and driver trainer, a certified nurse assistant, and a chicken inseminator. AR 42. The truck driver is medium and SVP 4. The trainer is light and SVP 7. The nurse's aide is medium and SVP 4, but very heavy as performed. The poultry inseminator is medium and SVP 3. AR 42-43.

For the first hypothetical, the ALJ asked the VE to assume a 43-year-old individual with a high school education and Plaintiff's past work. This individual could lift 10 pounds both occasionally and frequently, could stand and walk for a total of two hours in a day and could sit for a

total of six hours in a day.  This individual also could occasionally bend, stoop, twist, squat, kneel, crawl and climb stairs, but should not climb ladders, ropes or scaffolding.  Additionally, this individual should not work at heights or around hazardous moving machinery.  The VE testified that this individual could perform work as an information clerk, which is sedentary and SVP2, with 11,000 jobs in California; office clerk, which is sedentary and SVP2 with 19,000 jobs; and assembly, which is sedentary and SVP2, with 4,000 jobs.  AR 43.  The VE confirmed that these job classifications were consistent with those in the Dictionary of Occupational Titles.  AR 43.

For the second hypothetical, Plaintiff's attorney asked the VE to assume that the person in the prior hypothetical was limited to sitting for four hours in an eight hour work day.  The VE testified that this would preclude the jobs.  AR 44.

For the third hypothetical, Plaintiff's attorney asked the VE to assume that the person in the first hypothetical was limited to occasional reaching, handling, fingering, and feeling with the left hand, and frequent reaching, handling, fingering and feeling with the right hand.  The VE testified that this would preclude the jobs.  AR 44.

Medical Record

Plaintiff began attending physical therapy in September 2005, but was discharged in December 2005 for lack of attendance.  AR 336.

Beginning October 3, 2005, and continuing intermittently in February, March and July 2006, Plaintiff received treatment from Armen R. Kendig, D.C., for multiple complaints of back, neck, shoulder, head and wrist pain.  According to a radiographic evaluation of her lumbosacral/pelvic spine, Plaintiff had narrowed disc spacing at L3/4, L4/L5, and L5/S1, posterior spurring at L4/L5 and L5/S1 and anterior spurring at L3/L4, L4/L5, and L5/S1.  AR 251-58.

On October 19, 2005, Dr. Joseph Nguyen, D.O., completed a physician's supplementary certificate for the Employment Development Department.  He opined that Plaintiff had poor pain tolerance with increased exacerbations throughout the day.  He estimated that she could return to work in January 2006.  AR 270.

Plaintiff attended physical therapy in January and February 2006.  AR 333-35.  On February

24, 2006, Plaintiff was discharged from physical therapy and provided a home program. The therapist noted that although short term goals were met, Plaintiff was doing little stretching and exercise at home and still reported pain at 6/10. She was seeing a chiropractor for her back. AR 341.

On July 20, 2006, Dr. Arthur Wyatt released Plaintiff to work. There were no objective findings on examination and her neck/back strain was resolved. AR 267. Plaintiff was able to lift about 35 pounds and could use a hand truck. AR 268. On July 24, 2006, Dr. Wyatt opined that Plaintiff's diagnoses of hypertension and borderline diabetes were under control and she was cleared for work. AR 266.

On October 28, 2007, Plaintiff sought emergency room treatment for pain in her right knee and back. She explained that she had been jarred while in a truck and received a muscle strain to the back. She continued to have pain in her mid to lower back and right medial knee pain. On examination, she had tenderness in her back and extremities, but her range of motion was within normal limits. AR 284. Lumbar spine x-rays showed degenerative disc disease at L4-5 and L5-S1 and minimal osteophytic spurring. AR 288. Right knee x-rays were normal. AR 289.

On November 1, 2007, Plaintiff reported that she had been injured on October 1, 2007, while working as a truck driver. In a Doctor's First Report of Occupational Injury, Robert Walker, D.C., indicated that testing produced neck and back pain, along with posterior cervical, thoracic and lumbar paravertebral myofascial tenderness. He diagnosed cervical, thoracic, lumbar segmental dysfunction and sprain/strain, paraspinal myofascitis and insomnia. Plaintiff was to begin adjustments, myofascial release techniques, electrical muscle stimulation and therapeutic exercises and stretches. AR 318-20.

On November 9, 2007, Plaintiff sought clinical treatment from Dawnette Person, FNP-C, for complaints of back and right knee pain. Nurse Person noted that Plaintiff moved well in the examination, but her neck was tender to palpation. She was tender at the trapezius and right lumbar spine, but had no edema and normal strength. AR 262.

On November 15, 2007, Plaintiff sought follow-up treatment for her right knee pain and right

shoulder pain.  AR 280.  In January 2008, she was referred to physical therapy.  AR 387.

On December 18, 2007, a nerve conduction study of the upper extremities was normal, but there was electrodiagnostic evidence of cervical radiculopathy involving the left C5 and C6 nerve roots.  Clinical correlation with MRI was recommended.  AR 466-67.  A MRI of the cervical spine showed broad based disc protrusion at C3/C4 and C4/C5, which produced mild spinal canal narrowing.  There were mild disc degenerative changes at C3/C4 and C4/C5.  Additionally, Plaintiff had reversal of the normal lordotic curvature of the cervical spine and range of motion in extension was restricted.  AR 475-76.  A MRI of the lumbar spine showed moderate degenerative disc changes at L4/L5, left central disc protrusion, bilateral moderate to marked spinal canal and neuroforminal narrowing causing impingement of the right L4 exiting nerve roots.  At L5/S1, there were moderate degenerative disc changes and disc protrusion, along with mild to moderate spinal canal and bilateral neuroforaminal narrowing causing impingement on the left L5 exiting nerve root.  At L3/L4, there was bilateral facet arthropathy narrowing the neuroforaminal and encroaching the L3 exiting nerve roots.  AR 479-80.

On February 8, 2008, Dr. Walker prepared a Primary Treating Physician's Permanent and Stationary Report for Worker's Compensation.  Following testing and a review of records, Dr. Walker opined that Plaintiff retained the ability to lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk less than 4 hours per 8 hour day and could sit less than 4 hours per 8 hour day.  She had difficulty with repeated grasping, pushing and pulling with her left upper extremity.  She occasionally could climb, balance, stoop, kneel, crouch, crawl and twist.  She could reach, handle, finger and feel frequently with her right and occasionally with her left.  Dr. Walker opined that she could not return to her usual occupation.  AR 291-301.

On February 15, 2008, Plaintiff complained of stress, anxiety, depression, neck pain with radiation into left upper extremity, back pain and stiffness.  On examination, she had myofascial tenderness in the cervical, thoracic, and lumbar paravertebral tissues.  She had restricted spinal range of motion.  Dr. Walker referred Plaintiff for a psychological evaluation. AR 304.

On March 15, 2008, Plaintiff sought emergency room treatment for chest pain and right knee pain. On examination, her range of motion for all extremities was within normal limits and her joints had no swelling. A chest CT study showed no acute abnormality. AR 326. A chest x-ray was normal. AR 328. A right lower extremity venous ultrasound showed no evidence of deep venous thrombosis. AR 327. She was diagnosed with chest pain, undiagnosed hypertension, history of tobacco use, obesity, and a right knee injury. AR 322-32.

In March 2008, Plaintiff again complained of right knee pain. AR 359-63. A MRI exam of Plaintiff's right knee on March 18, 2008, revealed a questionable tiny peripheral tear of the junction of the body and posterior horn of the medial meniscus. Otherwise, there was no evidence of a meniscal tear or significant abnormality except for a small joint effusion. AR 349. On March 29, 2008, Plaintiff's treating doctor diagnosed her with a right meniscal tear and referred her to orthopedics for evaluation. AR 358.

On March 31, 2008, Plaintiff received a follow-up stress test after being hospitalized with chest discomfort. Dr. Lee Spenzler opined that Plaintiff's ongoing chest discomfort seemed "very atypical" because it was present most of the day and her myocardial perfusion scan was completely normal. There was no evidence of any heart disease. AR 355.

On April 3, 2008, Dr. David W. Pong, a state agency physician, completed a Physical Residual Functional Capacity Assessment form. Dr. Pong opined that Plaintiff could lift and/or carry 10 pounds occasionally and frequently, could stand/or walk at least 2 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could climb, balance, stoop, kneel, crouch and crawl occasionally. She had no manipulative, visual, communicative or environmental limitations. AR 370-75.

On April 22, 2008, Dr. Bradley Daigle completed a consultative psychiatric evaluation. Plaintiff drove herself to the appointment. In recounting the history of her illness, she reported being denied for Worker's Compensation and receiving spotty evaluation and little or no treatment. She claimed herniated disks in her low back and neck. Although she had chronic pain, she did not take strong pain medication, only Ibuprofen. She denied any prior psychiatric illness, symptoms or

7

treatment.  She reported sometimes feeling stressed, but denied overt anxiety or depression.  AR 377-78.  As to her activities of daily living, she explained to Dr. Daigle that she drives without particular problems, goes out alone without any reported difficulty, does her own self-care, and performs light household chores, housecleaning, shopping and cooking.  AR 379.  On mental status exam, Plaintiff's mood was euthymic and her affect was within normal limits.  Her insight and judgment appeared intact.  AR 380.  Dr. Daigle concluded that Plaintiff had no psychiatric diagnosis.  Based on examination, she was not significantly limited in the abilities to understand, remember and carry out simple 1 or 2-step job instructions, to follow detailed and complex instructions, to relate and interact with supervisors, co-workers and the public, to maintain concentration and attention, persistence and pace, to associate with day-to-day work activity, including attendance and safety and to adapt to the stresses common to a normal work environment.  AR 381.

On April 28, 2008, Plaintiff was seen in the orthopedic clinic for right knee pain.  AR 385-86.  Knee x-rays showed minimal joint narrowing involving the medial compartments.  AR 388.

On May 12, 2008, Mark Stevenson, Ph.D., a state agency medical consultant, completed a Psychiatric Review Technique form.  He opined that Plaintiff did not have a medically determinable mental impairment.  AR 389.

On June 19, 2008, Dr. Walker requested that Plaintiff be evaluated by a neurosurgeon due to spinal cord compression.  AR 409.

On July 3, 2008, Plaintiff was evaluated for right knee pain by Dr. Brian Davis in the UC Davis Health System.  On examination, there was no effusion at the right knee.  Her range of motion was somewhat limited with pain reported anterior at the knee.  Plaintiff was given a steroid injection to the right knee.  Dr. Davis talked with Plaintiff about trying to start exercises, but Plaintiff was "really dead set against" it.  AR 489-90.

On July 8, 2008, Plaintiff complained of left-sided headaches, neck pain with radiation into left upper extremity, weakness in the left upper extremity, muscle tremors in left upper and lower extremities, back pain and stiffness.  On examination, she had myofascial tenderness in the cervical, thoracic, and lumbar paravetebral tissues, weakness in the left upper extremity and restricted spinal

8

1   ranges of motion.  AR 408.  Dr. Walker encouraged Plaintiff to remain active and do prescribed

2   exercises and stretches.  AR 408.

3          On August 27, 2008, Dr. Davis prepared a letter summarizing his treatment of Plaintiff's

4   right knee pain.  Dr. Davis explained that on her last visit, she was provided a steroid injection.  She

5   reportedly called several days later reporting a huge increase in pain and swelling.  When offered an

6   urgent evaluation, she reported that she was unable to make it.  When offered other appointments,

7   she again reported that she was unable to make it.  Dr. Davis' nursing staff indicated "she was very

8   difficult to communicate with."  Plaintiff later told Dr. Davis that she had symptoms of muscles

9   jumping and a feeling of inflammation and shifting to the lateral aspect of the right knee.  Plaintiff

10  claimed she had to use crutches and her pain currently was an 8 out of 10.  Plaintiff also informed

11  Dr. Davis that she had not been doing anything exercise-wise and her additional problems affected

12  any ability for her to return back to work.  On examination, there was no evidence of effusion

13  identified at the right knee and all ligaments were intact.  With gentle passive maneuvers, Dr. Davis

14  was able to get her knee to full extension with no pain at the extremes.  Palpation around the patella

15  caused pain, both along the medial and the lateral patellar facet.  Plaintiff's gait was entirely normal,

16  with no evidence of antalgia.  Plaintiff demonstrated a "high degree of frustration and a moderate

17  degree of pain behaviors."  AR 486.  Dr. Davis found her right knee pain of unclear etiology.  He

18  noted that although she had some mild changes on MRI suggestive of meniscal tear, she had no

19  significant response to the injection, calling into question that diagnosis.  AR 486.  Dr. Davis

20  discussed options with Plaintiff, including physical therapy.  Plaintiff reported that doing anything

21  active will cause more knee pain and physical therapy was "pointless," as she had already tried doing

22  it on her own.  Dr. Davis talked with her about possibly using a bicycle, but Plaintiff stated that there

23  was no way that she could use a bicycle because her back and her neck hurt.  Dr. Davis

24  recommended that she start from a pool environment to begin activating all of her cervical, lumbar

25  and knee areas, but Plaintiff was very negative and acted very frustrated.  Dr. Davis informed

26  Plaintiff that he was concerned about her negative attitude and that maybe they should consider her

27  being seen by somebody else.  Plaintiff wanted to proceed with therapy and surgical evaluation.  She

28

1   asked for additional pain medication because hydrocodone did not work.  Dr. Davis explained that

2   any additional medication would need to be provided by her primary physician.  Plaintiff again was

3   frustrated.  When Dr. Davis suggested that she might want to be retrained vocationally, Plaintiff

4   again became very frustrated and said she would have to write with her teeth.  Dr. Davis believed

5   that Plaintiff had very limited potential for improvement based on his interaction with her.  AR 486-

6   87.

7        On August 29, 2008, Dr. Andrew Burt, an orthopedic surgeon, completed an Agreed Medical

8   Evaluation.  On physical examination, Plaintiff did not walk with a limp or use any supportive

9   device.  Her neck revealed no abnormality, but Plaintiff complained of tenderness to palpation in the

10  left cervical paraspinous area and over the trapezius.  She had limited range of motion of the cervical

11  spine and there was spasm in the cervical paraspinous muscles.  Plaintiff's deep tendon reflexes were

12  normal and equal bilaterally.  On sensory examination of her upper extremities, she had glove-like

13  numbness at the left upper extremity below the mid-forearm, not corresponding to a dermatome

14  distribution.  She had no atrophy.  Range of motion of her left shoulder was normal, with complaints

15  of some pain at the extremes of motion.  She had limited range of motion of the lumbar spine and

16  there was spasm in the lumbar paraspinous muscles with extension and lateral bending.  She could

17  sustain a heel or toe walk, but complained of increased lumbar pain.  Dr. Burt noted that during the

18  course of examination there was considerable pain behavior.  Plaintiff complained of severe pain to

19  light touch of the skin along the neck and back.  In the seated position with attention diversion,

20  straight-leg-raising could be completed to 90 degrees without apparent response.  AR 523-531.

21       Dr. Burt diagnosed Plaintiff with chronic discogenic neck pain with left upper extremity

22  radiculopathy and bilateral radicular symptoms, herniated cervical disc (left C5-6), post-traumatic

23  rotator cuff tendinitis (left), significant degenerative disc disease (L4-5 and L5-S1), annular

24  protrusion/disc herniation (left L4-5), and annular disc protrusion/herniation.  Dr. Burt indicated that

25  Plaintiff's cervical spine had some minor bulging of the discs at two levels other than the herniated

26  level, which was not unusual in a person in her 40s.  Dr. Burt indicated that there was no evidence to

27  support Dr. Walker's suggestion that there was disability based on corticospinal tract impairment.

28                                          10

Dr. Burt believed future treatment might include anti-inflammatory and pain medications, or physical therapy modalities.  He also recommend a chronic pain management program due to Plaintiff's history of ongoing pain and significant depression. If Plaintiff's radicular symptoms became intolerable, Dr. Burt suggested she might be a candidate for cervical or lumbar epidural steroid injections or possible decompressive surgery.  AR 531-33.  Dr. Burt believed vocational rehabilitation was indicated and Plaintiff could not go back to her job as truck driver because of the sitting, lifting, pushing, pulling and prolonged positioning required in that job.  AR 535.

On October 30, 2008, Dr. Madelaine Aquino evaluated Plaintiff for pain management.  On examination, Plaintiff had decreased cervical forward flexion and extension due to pain and tightness.  She had decreased extension and lateral flexion of the LS spine.  She had tenderness and tightness of the cervical and lumbar paraspinal muscles.  Her motor exam showed a mild decrease in the proximal upper extremities.  Her sensory exam was normal.  Dr. Aquino diagnosed chronic neck and low back pain, degenerative disc disease, myofascial pain and lumbar and cervical radiculopathy. Dr. Aquino prescribed medications and a patch.  She also recommended physical therapy.  AR 514-16.

On November 3, 2008, Plaintiff was rear ended in a motor vehicle accident and sought emergency room treatment.  She complained of neck and mid back pain, along with left-sided facial numbness.  AR 444, 449.  A neck x-ray showed slight reversal of the normal cervical curvature and mild degenerative changes at C5-C6.  AR 451.  On discharge, she ambulated to the lobby with a steady gait and no obvious distress.  AR 447.  She was excused from work through November 5, 2008.  AR 445.

On December 1, 2008, Plaintiff claimed that she saw a note from Dr. Aquino's office stating that "the patient is inconsistent with her claim...."  AR 504.  Plaintiff reportedly called Dr. Aquino's office on November 13, 2008, complaining that Dr. Aquino was not understanding her many conditions.  AR 504.  On objective examination, Plaintiff was lying on the table and got up without much difficulty.  She had a normal gait pattern, but tenderness through her neck and back.  Dr. Aquino diagnosed Plaintiff with chronic pain syndrome, degenerative disc disease, myofascial pain,

11

1  and lumbar and cervical radiculopathy.  AR 504.  Dr. Aquino indicated that the note Plaintiff

2  claimed to have read was not in the records or in the report to physical therapy.  Plaintiff seemed to

3  be negative about her medical treatments and health care providers.  Dr. Aquino doubted that further

4  treatment would provide any improvement if Plaintiff continued to be difficult.  Dr. Aquino

5  concluded she could not continue care for Plaintiff.  AR 505.

6         On December 10, 2008, Dr. Aquino dismissed Plaintiff from her care.  AR 503.

7         On December 17, 2008, Dr. Walker reported that Plaintiff completed her prescribed physical

8  therapy with good results.  However, she needed another doctor because the past doctor did not want

9  to see her again.  She was referred to another doctor for pain management and provided a home

10  TENS device.  AR 500.

11         On January 6, 2009, Dr. Walker referred Plaintiff for pain management.  He also provided

12  her with an electrical muscle stimulator ("EMS") for home use to decrease symptoms and increase

13  activities of daily living.  Plaintiff was encouraged to remain active and do prescribed exercises and

14  stretches.  AR 496.  Dr. Walker noted that Plaintiff had decreased symptoms and increased range of

15  motion and function with use of EMS in the past.  AR 497.

16         On November 6, 2009, Dr. Les P. Kalman completed a psychiatric evaluation.  He noted that

17  Plaintiff's posture and gait were normal, but she exhibited decreased psychomotor activity.   She

18  complained that she has been depressed since her injury in October 2007, and had anxiety and

19  worries.  On mental status exam, her mood was anxious and depressed and her affect was restricted.

20  She admitted to suicidal thoughts and reported insomnia, anhedonia, impaired concentration,

21  decreased energy and feelings of hopelessness, helplessness, and worthlessness.  As to her daily

22  activities, Plaintiff indicated that she did limited cooking, shopping, housekeeping and transportation

23  as she was physically able.  She was capable of caring for her own personal hygiene.  Her current

24  medications included Ibuprofen and Tylenol.  Dr. Kalman diagnosed Plaintiff with an adjustment

25  disorder mixed with anxiety and depression secondary to her medical condition.  He assigned her a

26  Global Assessment of Functioning ("GAF") of 50, and opined that her condition was not expected to

27  improve in the next 12 months unless her medical condition improved.  AR 453-55.

28

On the same date, Dr. Kalman completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment form.  He opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions or tasks, in the ability to carry out detailed instructions, and in the ability to maintain attention and concentration for extended periods.  AR 457-58.  She also was moderately limited in the ability to accept instructions and to respond appropriately to criticism from supervisors.  AR 459.  Dr. Kalman indicated that certain work-related stressors would increase her level of impairment, including unruly, demanding or disagreeable customers even on an infrequent basis, production demands or quotas, a demand for precision, a need to make quick and accurate, independent decisions in problem solving on a consistent basis, and a need to make accurate, independent decisions in problem solving on a consistent basis.  However, Dr. Kalman indicated that a routine, repetitive, simple, entry-level job would not serve as a stressor that would exacerbate instead of mitigate psychological symptoms in the workplace.  AR 459.  Her impairments were sufficiently severe that more than three or four times per month she would be unable to complete a workday.  AR 460.

ALJ's Findings

The ALJ found that Plaintiff met the insured status requirements through March 31, 2010, and had not engaged in substantial gainful activity since October 18, 2007.  The ALJ further found that Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine and obesity.  Despite these impairments, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to lift 10 pounds frequently and occasionally, stand and walk two hours in an eight-hour workday, and sit a total of six hours in an eight-hour workday.  She was limited to occasional bending, stooping, squatting, kneeling and climbing stairs.  She should avoid climbing ladders, ropes and scaffolds and should avoid working around hazards such as heights and machinery.  With this RFC, the ALJ concluded that Plaintiff could not perform her past relevant work, but could perform other jobs existing in the national economy.  AR 13-19.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. § 404.1520(a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged

1   in substantial gainful activity since October 18, 2007; (2) has an impairment or a combination of

2   impairments that is considered "severe" (degenerative disc disease of the cervical and lumbar spine

3   and obesity) based on the requirements in the Regulations (20 C.F.R. § 404.1520(c)) does not have

4   an impairment or combination of impairments which meets or equals one of the impairments set

5   forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform her past relevant work; but (5)

6   can perform jobs that exist in significant numbers in the national economy.  AR 14-19.

7          Here, Plaintiff contends that the ALJ's residual functional capacity assessment was

8   unsupported.  Specifically, she contends that the ALJ erred by: (1) rejecting the opinion of her

9   chiropractor; (2) rejecting her subjective complaints; and (3) failing to consider lay witness

10  testimony.

11                          **DISCUSSION**

12  A.      Residual Functional Capacity Assessment

13         Plaintiff contends that the ALJ erred in concluding that she could lift 10 pounds, could stand

14  and walk two hours in an eight-hour workday, could sit a total of six hours in an eight-hour workday,

15  could occasionally bend, stoop, squat, kneel and climb stairs, but should avoid climbing ladders,

16  ropes and scaffolds and should avoid working around hazards such as heights and machinery.  In

17  particular, Plaintiff argues that the ALJ erred by omitting left arm or hand limitations and sitting

18  limitations, despite objective evidence of nerve damage and compromise in the neck and low back.

19  Opening Brief, p. 7.

20         As an initial matter, Plaintiff appears to reject the ALJ's analysis of the medical record, citing

21  an electromyogram and MRI studies of Plaintiff's cervical and lumbar spines.  However, Plaintiff's

22  interpretation of the records does not render the ALJ's findings and conclusions regarding her RFC

23  improper.  The ALJ expressly considered the electrodiagnostic testing, the lumbar spine MRI and x-

24  rays of the cervical spine.  These objective reports included diagnoses, but did not identify any

25  functional limitations.  It is well established that the mere diagnosis of an impairment is insufficient

26  to establish disability.  *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of

27  impairment is insufficient proof of disability); *see also Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir.

28                                      15

1    1985).

2          Plaintiff next argues that the ALJ erred in rejecting the limitations imposed by her

3    chiropractor, Dr. Walker.  Plaintiff asserts that Dr. Walker reviewed the medical reports, including

4    radiological findings, conducted additional testing and thereafter limited Plaintiff to sitting fewer

5    than 4 hours per day and occasional reaching, handling and feeling on the left.  Opening Brief, p. 6.

6          The ALJ gave little weight to Dr. Walker's opinion in part because it was "from a

7    nonacceptable medical source."  AR 16.  As correctly stated by the ALJ, a chiropractor is not an

8    "acceptable medical source."  20 C.F.R. § 404.1513(a).  However, an ALJ "may" consider the

9    opinion of an "other" medical source, such as a chiropractor, to determine the severity of a

10   claimant's impairments.  20 C.F.R. § 404.1513(d)(1); *see also Bunnell v. Sullivan*, 912 F.2d 1149,

11   1152 (9th Cir. 1990) (no requirement that Commissioner accept or specifically refute chiropractic

12   evidence), *modified on other grounds by* 947.F.2d 341 (9th Cir. 1991).  Here, Plaintiff does not

13   assert that Dr. Walker is an acceptable medical source.  Instead, Plaintiff suggests that the ALJ erred

14   by "silent disregard" of Dr. Walker's opinion.  The Court disagrees.

15         It is clear from the record that the ALJ evaluated Dr. Walker's opinion, but assigned it little

16   weight because it was "inconsistent with objective evidence in the record."  AR 16.  Plaintiff

17   contends that objective medical evidence supported Dr. Walker's proposed limitations, including the

18   findings of cervical radiculopathy, nerve root impingement and canal narrowing in the cervical and

19   lumbar spines.  Despite her contentions, Plaintiff fails to acknowledge the ALJ's deference to the

20   opinion of examining orthopedic physician, Dr. Burt.  *See Gomez v. Chater*, 74 F.3d 967, 970-71

21   (9th Cir. 1996) (explaining that opinions from "other sources" may be given less weight than those

22   from "acceptable medical sources" under the governing regulations).  The ALJ considered Dr. Burt's

23   disagreement with Dr. Walker's opinion that Plaintiff was disabled based on corticospinal tract

24   impairment because it was not supported by evidence on physical examination or diagnostic studies.

25   AR 16, 531-33.  Dr. Walker's opinion was not entitled to the same deference and analysis as a

26   medical doctor, and the ALJ was not required to adopt his conflicting opinion.  *See Batson v.*

27   *Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Magallanes v. Bowen*, 881 F.2d

28                                                    16

747, 750 (9th Cir. 1989) (ALJ is responsible for resolving conflicts in medical evidence).

In this case, the ALJ accorded greater weight to the functional limitations identified by the non-examining state agency physician. AR 15-16. The reports of non-examining advisors "need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997). In adopting the opinion of the state agency physician, the ALJ found that it was consistent with objective evidence of record and observations by Plaintiff's treating physicians. AR 16. The ALJ noted the state agency physician's reliance on medical records showing that Plaintiff had good motor function, normal range of motion of her extremities, no swelling of her joints and good grip strength. AR 15, 371, 374-75. For instance, the state agency physician relied on a March 2008 examination, which demonstrated that Plaintiff's range of motion for all extremities was within normal limits and her joints had no swelling. AR 324. The state agency physician also relied on examination reports from Dr. Walker demonstrating that Plaintiff had good grip strength, cervical range of motion impairment of 11% and lumbar range of motion impairment of 13%. AR 374. The ALJ additionally cited findings by Plaintiff's treating doctors that she had a normal gait and she got up from the examination table without difficulty. AR 16. Record evidence also includes a motor exam showing only a mild decrease in the proximal upper extremities and a normal sensory exam. AR 514-16. Further, in August 2008, Plaintiff had glove-like numbness at the left upper extremity below the mid-forearm that did not correspond to a dermatome distribution and she had normal range of motion of her left shoulder. AR 523-531.

Accordingly, the ALJ's RFC determination was supported by substantial evidence and free of legal error.

B.     Subjective Complaints

Plaintiff next argues that the ALJ failed to provide clear and convincing reasons for rejecting her claims of pain and left arm numbness.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the

pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's

subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide " 'specific, cogent reasons for the disbelief.' " *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony ... An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

Plaintiff asserts that the ALJ showed "silent disregard" for her specific complaints of left arm

limitations, numbness and pain.  Opening Brief, p. 7.  Plaintiff's assertion is without merit.  First, the

ALJ properly based his negative credibility determination on inconsistencies between Plaintiff's

testimony, and her conduct, daily activities, and other record evidence.  *See Bray v. Comm'r of Soc.*

*Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir.

2005) (upholding ALJ's credibility finding that claimant's daily activities suggested she was "quite

functional" where she cared for her own personal needs, cooked, cleaned, shopped, interacted with

her nephew and her boyfriend and managed her own funds).  Here, Plaintiff claimed significant

limitations in sitting, standing, walking and lifting, but the ALJ considered contrary treatment

observations, which noted that she moved well in the examination room, got up from the

examination table without difficulty and had a normal gait pattern.  AR 17, 262, 504.  The ALJ also

considered Plaintiff's report that she could drive a motor vehicle, go out alone without difficulty, do

light household chores and housecleaning, shop, cook and perform her own self-care.  AR 17, 379.

1   Indeed, Plaintiff's testimony suggested that, amongst other things, she vacuumed, swept and

2   scrubbed floors on her hands and knees.  AR 36-37, 40.

3         Second, the ALJ properly discounted Plaintiff's asserted limitations based on her inconsistent

4   statements regarding her abilities. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ

5   may engage in ordinary techniques of credibility evaluation, such as considering inconsistencies in

6   claimant's testimony).  Specifically, the ALJ cited Plaintiff's contrary reports regarding both her

7   walking and lifting abilities, and her ability to provide self-care.  AR 17, 36-40, 379, 453-55.

8         Third, and finally, the ALJ properly considered Plaintiff's non-compliance with

9   recommended treatments in assessing her credibility. "[A]n unexplained, or inadequately explained,

10  failure to ... follow a prescribed course of treatment ... can cast doubt on the sincerity of the

11  claimant's pain testimony." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). Therefore,

12  noncompliance with a prescribed course of treatment is a clear and convincing reason for finding a

13  Plaintiff's subjective complaints lack credibility. *Id.; see also Tonapetyan*, 242 F.3d at 1147-48.  The

14  record supports the ALJ's determination that Plaintiff was noncompliant with treatment

15  recommendations.  Specifically, the ALJ considered Dr. Davis' notation that he spoke to Plaintiff

16  about an exercise program, but that she was "dead set against it" and was resistant to his

17  recommendations at more than one appointment.  AR 17, 486-87, 489-90.  Additionally, the ALJ

18  cited Dr. Aquino's report that Plaintiff was negative towards treatment, which caused Dr. Aquino to

19  conclude that treatment would not be successful.  AR 17, 504-05.  Indeed, the record reflects that Dr.

20  Aquino ultimately discharged Plaintiff from care because she was negative and difficult.  AR 503.

21  Plaintiff has not offered any explanation for her failure to comply with treatment, nor has she

22  challenged this portion of the ALJ's credibility findings.

23        Based on the above, the ALJ provided clear and convincing reasons for discrediting

24  Plaintiff's testimony.[2]

25

26      [2]   In addition to arguing that the ALJ improperly discredited her testimony, Plaintiff asserts that the presence of
    radicular pain supports her depression claim, and the two should have been considered together.  Opening Brief, pp. 7 8.

27  In short, Plaintiff appears to argue that depression was a natural result of her radicular pain.  Although unclear, this argument

28                                           19

C.      Lay Witness Testimony

Plaintiff also argues that the ALJ erred by failing to provide germane reasons for rejecting "other lay testimony." An ALJ must take into account competent lay witness testimony, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Here, Plaintiff's friend, Ronny Harmon, provided written lay witness testimony that Plaintiff had trouble washing and brushing her hair, shaving and using utensils due to pain in her left arm. AR 180. The ALJ did not address this testimony and erred by failing to provide germane reasons for disregarding it.

Nonetheless, this error was harmless. To the extent that the ALJ found Plaintiff's reports of left arm pain and limitations unsupported when contrasted with her daily activities and failure to comply with treatment, he implicitly rejected the duplicative lay witness testimony. Thus, any error in failing to comment on Mr. Harmon's report was harmless. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (harmless error analysis); *see also Ontiveros v. Astrue*, 2009 WL 4349604 (C.D. Cal. Nov. 24, 2009) (harmless error analysis applied to lay witness statements that were merely corroborative of other evidence in the record); *cf. Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (where ALJ failed to make a legally sufficient adverse credibility finding with regard to claimant's own testimony it was error to ignore lay witness testimony of claimant's son).

D.      Vocational Expert Testimony

Plaintiff argues that the VE's testimony establishes disability at step five given her left hand and arm limitations and her sitting limitations. However, as discussed above, the ALJ's RFC finding was supported by substantial evidence and free of legal error. Therefore, the ALJ was not required to incorporate the left upper extremity limitations and sitting limitations claimed by Plaintiff in the

seems to challenge the ALJ's finding that Plaintiff's depression was not a severe mental impairment. In this case, the ALJ gave greater weight to the consultative examiner, Dr. Daigle, who found that Plaintiff did not have a medically determinable mental impairment. AR 13 14, 377 81. Plaintiff has not argued that the ALJ improperly credited Dr. Daigle's opinion or the supporting opinion of the state agency physician. Further, Plaintiff reported that she had never been treated for any mental or emotional problems and she does not take any medication to help with such problems. AR 38 39.

hypothetical question posed to the VE.  An ALJ is only required to present the VE with those limitations he finds to be credible and supported by the evidence.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001).

### RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is based on proper legal standards.  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Catherine Sanchez.

These findings and recommendations will be submitted to the Honorable Anthony W. Ishii pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:   June 15, 2011**                    **/s/ Dennis L. Beck**
                               UNITED STATES MAGISTRATE JUDGE